# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

EDGAR COBB, Individually and on Behalf of All Others Similarly Situated,

      Plaintiff,

v.

AMERICAN OIL & GAS INC., a Nevada Corporation,
PATRICK D. O'BRIEN,
ANDREW P. CALERICH,
JON R. WHITNEY,
NICK DeMARE,
SCOTT HOBBS and
HESS CORPORATION, a Delaware Corporation,

      Defendants.

---

## COMPLAINT FOR BREACH OF FIDUCIARY DUTIES

**INTRODUCTION**

1.      This is a stockholder class action brought by plaintiff on behalf of the holders of American Oil & Gas Inc. ("American Oil" or the "Company") common stock against American Oil, its Board of Directors (the "Board") and Hess Corporation ("Hess"), arising out of their breaches of fiduciary duty and/or aiding and abetting such breaches of fiduciary duty in connection with their agreement to enter into a merger transaction whereby Hess will acquire American Oil via an unfair process and at an unfair price (the "Proposed Buyout").

2.      American Oil is an independent oil and gas exploration and production company, incorporated in Nevada, engaged in acquiring oil and gas mineral leases and in the exploration and development of crude oil and natural gas reserves and production in the Rocky Mountain region of the United States.  American Oil's focus has been on building large acreage positions in the Rocky Mountain region and performing initial drilling and completion activities in an attempt to establish commercial production in these areas.  As of December 31, 2009, American Oil owned interests in approximately 514,000 gross (320,600 net) acres primarily in the Powder River Basin of Wyoming, in the Williston Basin of North Dakota and in its Bigfoot project in the Rocky Mountain region.  In the Powder River Basin, its major projects are Fetter and Krejci. In the Williston Basin, its major project is Goliath, where it is drilling lateral wells to the Bakken and Three Forks oil formations. During the year ended December 31, 2009, it drilled 11 gross (8.25 net) shallow gas wells at Bigfoot, acquired interests in 10 gross (0.6 net) wells previously drilled at Goliath and sold interests in three gross (one net) wells previously drilled at Goliath.

3.      On July 27, 2010, Hess and American Oil jointly announced that both companies had entered into a merger agreement whereby each outstanding share of American Oil common stock

would be exchanged for 0.1373 shares of Hess common stock (the "Merger Agreement").  This amount, according to the joint press release, represents a mere 9.4% premium to the price of American Oil's stock at closing on July 27, 2010.  But the market viewed the Proposed Buyout even less favorably.  After the announcement, on July 28, 2010, American Oil's shares closed at $7.14 per share, representing only a 6.73% increase from the day before.  The July 28, 2010 closing price also represents a ***discount*** to American Oil's stock price on May 3, 2010, which hit $7.74 per share.

4.      The Proposed Buyout also amounts to a significant discount to analysts' expectations of American Oil's stock price.  According to Thomson/First Call, one analyst set a target price of ***$10.00 per share*** and the mean target of all analysts covering American Oil was $8.79 per share before the announcement of the Proposed Buyout.

5.      American Oil's stockholders have also enjoyed tremendous gains in the value of their stock throughout the past year.  The paltry consideration offered by Hess does not take into account the significant recent improvement in American Oil's financial performance, which propelled the Company's stock price from just $0.61 per share to $6.69 per share on July 27, 2010, ***representing a 1,000% increase***.  That rise would have continued unabated but for the announcement of the Proposed Buyout on July 27, 2010, which serves to temporarily restrict the ascension of American Oil's stock price.  Over the next four quarters, according to Thomson/First Call, analysts predict astounding 822.50% and 265.70% increases in American Oil's sales growth over this year and next, respectively.  For the next quarter, analysts predict a ***1,150%*** increase in American Oil's sales.

6.      Hess's stock price, on the other hand, has decreased nearly 20% in the past three months alone.  Notably, Hess's production in the United States was derived principally from properties offshore in the Gulf of Mexico, which include the Shenzi (Hess 28%), Llano (Hess 50%),

- 2 -

Conger (Hess 38%), Baldpate (Hess 50%), Hack Wilson (Hess 25%) and Penn State (Hess 50%) fields.  According to its last annual report, Hess had actually planned on *increasing* its drilling operations in the Gulf of Mexico in 2010.

      7.     Thus, if the Proposed Buyout is allowed to proceed, American Oil shareholders – who have seen a 1,000% increase in their stock in the past year – will be forced to turn over their American Oil shares in exchange for rapidly declining securities in a company whose primary U.S. production in 2009 came from the Gulf of Mexico.  In the wake of the BP disaster, that is not a good trade.

      8.     To illustrate, American Oil's stock price over the past 12 months is compared to that of Hess in the chart below:



      9.     The individual defendants, on the other hand, along with top Company executives, held a combined 8,199,762 shares of American Oil stock as of April 27, 2010, and stand to gain at least *$57 million* if the Proposed Buyout is consummated.  Much of these holdings are in the form of

illiquid large block or restricted stock options that could not have otherwise been sold in the near term.

10.      As part of the Merger Agreement, defendants agreed to several onerous, preclusive deal protection devices that effectively prevent other bidders from making successful topping bids for the Company.  Specifically, defendants agreed to:  (i) a termination fee of $13.5 million, plus expenses up to $2.25 million, that must be paid to Hess in cash in the unlikely event that defendants choose to accept a superior proposal; (ii) a no shop/no talk clause that prevents defendants from communicating with or providing Company information to competing bidders unless an unsolicited superior proposal is made; (iii) a matching rights provision, which mandates that the Board (a) notify Hess if a superior proposal is made, (b) keep Hess informed of the discussions regarding that proposal, and (c) "engage[] in good faith negotiations to amend" the Merger Agreement with Hess so that the "[a]lternative [t]ransaction ceases to constitute a [s]uperior [p]roposal"; and (iv) voting agreements that irrevocably bind the Company's largest shareholders and insiders to vote in favor of the Proposed Buyout.  In essence, the Proposed Buyout is a *fait accompli* that will deliver the Company to Hess on terms preferential to it and the individual defendants.

11.      In addition, despite Hess's heavy investments in the Gulf of Mexico and the related BP disaster, the Merger Agreement does not contain a "collar" or pricing adjustment provision in the event Hess's stock price drops below a certain percentage.  If the Proposed Buyout is not enjoined, American Oil shareholders are stuck with Hess stock at whatever price it has declined to at the time of closing, even if that price exists at a significant discount to the price at the time of announcement.  Put simply, the merger is already a bad deal and it could very well get even worse for American Oil shareholders if not enjoined.

12.     In pursuing the unlawful plan to sell the Company for less than fair value and pursuant to an unfair process, defendants have breached their fiduciary duties of loyalty, due care, independence, candor, good faith and fair dealing, and/or have aided and abetted such breaches. Instead of acting in the best interests of American Oil's shareholders, defendants spent a substantial effort tailoring the Proposed Buyout to meet their own needs and those of Hess. Immediate judicial intervention is warranted here to rectify existing and future irreparable harm to the Company's shareholders. Plaintiff seeks equitable relief only to enjoin the Proposed Buyout or, alternatively, rescind the Proposed Buyout in the event it is consummated.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(a)(2) in that plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs. This Court also has jurisdiction over this action pursuant to 15 U.S.C. §78bb(f)(3)(A)(i), because it is a class action based upon the statutory or common law of Nevada, American Oil's state of incorporation, and thus may be maintained in federal court. This Court has supplemental jurisdiction under 28 U.S.C. §1367.

14.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because defendant American Oil has its principle place of business in this District and defendant Hess does a substantial amount of business in this District as well. Plaintiff's claims arose in this District, where most of the actionable conduct took place, where most of the documents are electronically stored and where the evidence exists, and where virtually all the witnesses are located and available to testify at the jury trial permitted on these claims in this Court. Moreover, each of the individual defendants, as Company officers and/or directors, has extensive contacts with this District.

## PARTIES

15.     Plaintiff Edgar Cobb is, and at all times relevant hereto was, a shareholder of American Oil.  Plaintiff is a citizen of Florida.

16.     Defendant American Oil is an independent oil and gas exploration and production company engaged in acquiring oil and gas mineral leases and in the exploration and development of crude oil and natural gas reserves and production in the Rocky Mountain region of the U.S. American Oil is traded on the New York Stock Exchange under the ticker AEZ.  American Oil's principal offices are in Colorado and the Company is incorporated in Nevada.

17.     Defendant Patrick D. O'Brien ("O'Brien") is the CEO and Chairman of American Oil's Board and has occupied those positions since February 2003.  As of April 27, 2010, O'Brien held 2,873,859 shares of American Oil common stock, meaning that he will stand to gain over $20 million if the Proposed Buyout is consummated.  Along with these common stock holdings, O'Brien holds restricted stock options that, absent consummation of the Proposed Buyout, would not have been exercisable until 2014.  O'Brien is a citizen of Colorado.

18.     Defendant  Andrew P. Calerich ("Calerich") has been the Company's President since July 2003, a director since October 2003 and was CFO from July 2003 through June 29, 2006.  As of April 27, 2010, Calerich held 1,552,188, shares of American Oil common stock, meaning that he will stand to gain over $10 million if the Proposed Buyout is consummated.  Along with these common stock holdings, Calerich holds restricted stock options that, absent consummation of the Proposed Buyout, would not have been exercisable until 2014.  Calerich is a citizen of Colorado.

19.     Defendant Jon R. Whitney ("Whitney") has held a seat on American Oil's Board since February 2005.  Whitney is currently on the Board's Compensation Committee, Audit

Committee, and Nominating and Corporate Governance Committee.  As of April 27, 2010, Whitney

held 202,519 shares of American Oil stock.  Whitney is a citizen of Colorado.

20.     Defendant Nick DeMare ("DeMare") has been on the American Oil Board since

October 2003 and is currently on the Board's Compensation Committee, Audit Committee, and

Nominating and Corporate Governance Committee.  As of April 27, 2010, DeMare held 415,819

shares of American Oil stock.  DeMare is a Canadian citizen.

21.     Defendant Scott Hobbs ("Hobbs") has been on the American Oil Board since 2008

and is currently on the Board's Compensation Committee, Audit Committee, and Nominating and

Corporate Governance Committee.  As of April 27, 2010, Hobbs held 143,519 shares of American

Oil stock.  Hobbs is a citizen of Colorado.

22.     The defendants named above in ¶¶17-21 are sometimes collectively referred to herein

as the "Individual Defendants."

23.     Defendant Hess, a Delaware corporation with headquarters in New York, is a global

integrated energy company engaged in the exploration, production, purchase, transportation and sale

of crude oil and natural gas, as well as the production and sale of refined petroleum products.  Hess

is traded on the New York Stock Exchange under the ticker HES.

## CLASS ACTION ALLEGATIONS

24.     Plaintiff brings this action individually and as a class action on behalf of all holders of

American Oil stock who are being and will be harmed by defendants' actions described below (the

"Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or

other entity related to or affiliated with any defendant.

25.     This action is properly maintainable as a class action.

26.     The Class is so numerous that joinder of all members is impracticable.  According to American Oil's Securities and Exchange Commission ("SEC") filings, there are more than 60 million shares of American Oil common stock outstanding, held by hundreds if not thousands of shareholders geographically dispersed across the country.

27.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, *inter alia*, the following:

(a)     whether the Individual Defendants have breached their fiduciary duties of undivided loyalty, independence or due care with respect to plaintiff and the other members of the Class in connection with the Proposed Buyout;

(b)     whether the Individual Defendants are engaging in self-dealing in connection with the Proposed Buyout;

(c)     whether the Individual Defendants are unjustly enriching themselves and other insiders or affiliates of American Oil;

(d)     whether the Individual Defendants have breached any of their other fiduciary duties to plaintiff and the other members of the Class in connection with the Proposed Buyout, including the duties of good faith, diligence, honesty and fair dealing;

(e)     whether the defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other offers for the Company or its assets; and

(f)     whether plaintiff and the other members of the Class would suffer irreparable injury unless defendants' conduct is enjoined.

28.     Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

29.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

30.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

31.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

32.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## BACKGROUND TO THE PROPOSED BUYOUT

33.     American Oil is an independent oil and gas exploration and production company, incorporated in Nevada, engaged in acquiring oil and gas mineral leases and the exploration and development of crude oil and natural gas reserves and production in the Rocky Mountain region. American Oil's focus has been on building large acreage positions in the Rocky Mountain region and performing initial drilling and completion activities in an attempt to establish commercial production in these areas.  At December 31, 2009, American Oil owned interests in approximately 514,000 gross (320,600 net) acres primarily in the Powder River Basin of Wyoming, in the Williston

- 9 -

Basin of North Dakota and in its Bigfoot project in the Rocky Mountain region. In the Powder River

Basin, its major projects are Fetter and Krejci. In the Williston Basin, its major project is Goliath,

where it is drilling lateral wells to the Bakken and Three Forks oil formations. During the year ended

December 31, 2009, it drilled 11 gross (8.25 net) shallow gas wells at Bigfoot, acquired interests in

10 gross (0.6 net) wells previously drilled at Goliath and sold interests in three gross (one net) wells

previously drilled at Goliath.

      34.     On July 27, 2010, Hess and American Oil jointly announced that both companies had

entered into a merger agreement whereby each outstanding share of American Oil common stock

would be exchanged for 0.1373 shares of Hess common stock (the "Proposed Buyout"). The July

27, 2010 press release states:

### Hess Corporation to Acquire American Oil & Gas, Inc.

Hess Corporation and American Oil & Gas, Inc. jointly announced today that Hess
has agreed to acquire American Oil & Gas pursuant to a merger agreement approved
by the Boards of Directors of both companies in an all-stock transaction. The
acquisition will increase Hess' strategic acreage position in the Bakken oil play in
North Dakota by approximately 85,000 net acres.

     Under terms of the agreement, Hess has agreed to issue 0.1373 shares of its
common stock in exchange for each outstanding share of American Oil & Gas'
common stock. This represents a 9.4 percent premium to American Oil & Gas
stockholders based on the closing stock prices of Hess' and American Oil & Gas'
shares on July 27, 2010. It is expected that Hess would issue approximately 8.6
million shares for all outstanding American Oil & Gas shares and options on a net
settlement basis. The merger agreement provides for a possible cash dividend to
American Oil & Gas' stockholders to the extent of American Oil & Gas' positive
working capital as of the closing date (subject to certain adjustments that are
described in the merger agreement) and subject to available cash. Hess has
committed (subject to the terms and conditions of a customary commitment letter) to
provide American Oil & Gas with a $30 million working capital credit facility to
help finance American Oil & Gas' planned exploration and production activities and
other working capital needs prior to the closing of the transaction.

"This acquisition builds upon our strong land position in the Bakken, leverages our nearby infrastructure and offers operational synergies," said Greg Hill, President of Worldwide Exploration and Production at Hess.

"We believe this transaction captures the value that we have been able to create since our initial entry in the North Dakota Bakken play four years ago," said Pat O'Brien, CEO of American Oil & Gas.  "We are excited about the leverage our stockholders will gain not only to Hess' compelling Bakken position and developmental activities, but also to Hess' large and diverse global project portfolio."

The transaction is subject to customary closing conditions, including approval of American Oil & Gas' shareholders.  Holders of approximately 20.5 percent of American Oil & Gas common stock have agreed to vote their shares in favor of the merger.  Completion of the transaction is expected in the fourth quarter of 2010.  In connection with the transaction, Goldman, Sachs & Co. is acting as financial advisor to Hess, and Tudor, Pickering, Holt & Co. Securities Inc. is acting as financial advisor and provided a Fairness Opinion to American Oil & Gas.  Legal counsel is being provided by White & Case LLP for Hess and Patton Boggs LLP for American Oil & Gas.

35.    The Proposed Buyout, according to the joint press release, represents a mere 9.4% premium to the price of American Oil's stock at closing on July 27, 2010.  But the market viewed the Proposed Buyout even less favorably.  After the announcement, on July 28, 2010, American Oil's shares closed at $7.14 per share, representing only a 6.73% increase from the day before.  The July 28, 2010 closing price also represents a ***discount*** to American Oil's stock price on May 3, 2010, which hit $7.74 per share.

36.    The Proposed Buyout also represents a significant discount to analysts' expectations of American Oil's stock price.  According to Thomson/First Call, one analyst set a target price of ***$10.00 per share*** and the mean target of all seven analysts covering American Oil was $8.79 per share before the announcement of the Proposed Buyout.

37.    American Oil's stockholders have enjoyed tremendous gains in the value of their stock throughout the past year.  The paltry consideration offered by Hess does not take into account

the significant improvement in American Oil's financial performance that propelled the Company's stock price from just $0.61 per share to $6.69 per share on July 27, 2010, ***representing a 1000% increase***.  That rise would have continued unabated but for the announcement of the Proposed Buyout on July 27, 2010, which serves to temporarily restrict the ascension of American Oil's stock price.  Over the next four quarters, according to Thomson/First Call, analysts predict astounding 822.50% and 265.70% increases in American Oil's sales growth over this year and next, respectively.  For the next quarter, analysts predict a ***1,150.50%*** increase in American Oil's sales.

38.     Hess's stock price, on the other hand, has seen a nearly 20% decrease in the past three months.  Notably, Hess's production in the United States was derived principally from properties offshore in the Gulf of Mexico, which include the Shenzi (Hess 28%), Llano (Hess 50%), Conger (Hess 38%), Baldpate (Hess 50%), Hack Wilson (Hess 25%) and Penn State (Hess 50%) fields.  According to its last annual report, Hess had actually planned on increasing its drilling operations in the Gulf of Mexico in 2010.

39.     Thus, if the Proposed Buyout is allowed to proceed, American Oil shareholders – who have seen a 1,000% increase in their Company stock in the past year – will be forced to turn over their American Oil shares in exchange for rapidly declining securities in a company whose primary U.S. production in 2009 came from the Gulf of Mexico.  In the wake of the BP disaster, that is not a good trade.

40.     To illustrate, American Oil's stock price over the past 12 months is compared to that of Hess in the chart below:



41.    The Individual Defendants, along with top Company executives, held a combined 8,199,762 shares as of April 27, 2010, and stand to gain at least *$57 million* from their negotiation of the Proposed Buyout.  Much of these holdings are in the form of illiquid large block or restricted stock options that could not have otherwise been sold in the near term.

42.    As part of the Merger Agreement, defendants agreed to several onerous, preclusive deal protection devices that effectively prevent other bidders from making successful topping bids for the Company.

43.    Specifically, defendants agreed to a termination fee of $13.5 million, plus expenses up to $2.25 million, that must be paid to Hess in cash in the unlikely event that defendants choose to accept a superior proposal.  The termination fee of the Merger Agreement states, in part, as follows:

(a)    If this Agreement is terminated pursuant to Section 8.1(i), then the Company shall pay to Parent, concurrently with and as a condition to such termination, by wire transfer of immediately available funds to an account designated in writing by Parent, (i) a fee in the amount of $13,500,000 (the "Termination Fee"), (ii) all of Parent's out-of-pocket fees and expenses (including legal fees and expenses) actually incurred by Parent and its affiliates on or prior to the termination of this Agreement in connection with the transactions contemplated by this Agreement, which shall not exceed $2,250,000 (the "Expense Reimbursement") and

(iii) all principal, all accrued interest thereon and any other amounts owing under any Interim Facility (the "Facility Repayment").

44.     Defendants also agreed to a no shop/no talk clause that prevents defendants from communicating with or providing Company information to competing bidders unless an unsolicited superior proposal is made. That provision states, in part:

(a)     Subject to Sections 6.5(b) and 6.5(c), during the Post-Signing Period, neither the Company nor any of its Subsidiaries shall, nor shall the Company or any of its Subsidiaries authorize or permit any of their respective directors, officers, employees, affiliates, investment bankers, attorneys, accountants and other advisors or representatives (collectively, "Company Representatives") to, directly or indirectly, (i) solicit, initiate or take any action to facilitate or encourage, whether publicly or otherwise, the submission of any inquiries, proposals or offers or any other efforts or attempts that constitute, or may reasonably be expected to lead to, any Alternative Transaction (an "Acquisition Proposal"), (ii) enter into or participate in any discussions or negotiations, furnish any information relating to the Company or any of its Subsidiaries or afford access to the business, properties, assets, books or records of the Company or any of its Subsidiaries, or otherwise cooperate in any way with, or assist or participate in connection with any Acquisition Proposal, (iii) make a Change in Company Recommendation or (iv) enter into any agreement, agreement in principle, letter of intent, term sheet or other similar instrument relating to an Alternative Transaction or enter into any agreement or agreement in principle (other than an Acceptable Confidentiality Agreement as permitted by this Section 6.5) requiring the Company to abandon, terminate or fail to consummate the transactions contemplated hereby or breach its obligations hereunder or propose or agree to do any of the foregoing. Subject to Sections 6.5(b) and (c), the Company shall immediately cease and cause to be terminated any solicitation, encouragement, discussion or negotiation with any Persons conducted heretofore by the Company, its Subsidiaries or any Company Representatives with respect to any Alternative Transaction and shall use its (and will cause Company Representatives to use their) reasonable best efforts to require the other parties thereto to promptly return or destroy, in accordance with the terms of any confidentiality agreement with respect thereto, any confidential information previously furnished by the Company, the Company's Subsidiaries or Company Representatives thereunder. The Company will not terminate, amend, modify or waive any provision of any confidentiality or standstill agreement to which it is a party and shall enforce, to the fullest extent permitted under Applicable Law, the provisions of any such agreement, including, but not limited to, by obtaining injunctions to prevent any breaches of such agreements and to enforce specifically the terms and provisions thereof in any court having jurisdiction thereover.

(b)     Notwithstanding anything in this Agreement to the contrary, if at any time following the date of this Agreement and prior to the attainment of the Required Company Vote (but in no event after the attainment of the Required Company Vote) (i) the Company receives a bona fide written Acquisition Proposal from a Third Party without breaching its obligations under this Section 6.5, (ii) the Board of Directors reasonably determines in good faith, after consultation with its financial advisor (which shall be a financial advisor of nationally recognized reputation) and outside legal counsel, that such Alternative Transaction constitutes or such Acquisition Proposal is reasonably likely to lead to a Superior Proposal from such Third Party and (iii) the Board of Directors reasonably determines in good faith, after consultation with its outside legal counsel, that failure to take such action would constitute a breach of its fiduciary duties under Applicable Law, then the Company may (A) furnish information with respect to the Company and its Subsidiaries to such Third Party making such Acquisition Proposal and (B) enter into, participate and maintain discussions or negotiations with, such Third Party making such Acquisition Proposal; provided, that the Company (x) will not, and will not allow Company Representatives to, disclose any non-public information to such Third Party without entering into an Acceptable Confidentiality Agreement, and (y) will promptly provide to Parent any non-public information concerning the Company or its Subsidiaries provided to such Third Party which was not previously provided to Parent. The Company shall notify Parent promptly (but in any event within twenty-four (24) hours) of any Acquisition Proposals received by, or any such discussions or negotiations sought to be initiated or continued with, the Company or any Company Representatives, indicating the identity of such Third Party and providing to Parent a summary of the material terms of such Acquisition Proposal.

45.     Defendants also agreed to a matching rights provision, which mandates that the Board (a) notify Hess if a superior proposal is made, (b) keep Hess informed of the discussions regarding that proposal, and (c) "engage[] in good faith negotiations to amend" the Merger Agreement with Hess so that the "[a]lternative [t]ransaction ceases to constitute a [s]uperior [p]roposal":

The Company shall keep Parent informed, on a reasonably prompt basis, of the material terms of any Acquisition Proposals and of any material developments in respect of any such discussions, negotiations or Acquisition Proposals and shall deliver to Parent a summary of any material changes to any such Acquisition Proposals.

(c)     Notwithstanding anything in this Agreement to the contrary, if prior to the attainment of the Required Company Vote (and in no event after the attainment of the Required Company Vote), the Board of Directors receives a Superior Proposal without breaching its obligations under this Section 6.5 and the Board of Directors

- 15 -

reasonably determines in good faith after consultation with its outside counsel that the failure to take such action would constitute a breach of its fiduciary duties under Applicable Law, the Board of Directors may (i) effect a Change in Company Recommendation and/or (ii) terminate this Agreement pursuant to Section 8.1(i) to enter into a definitive agreement with respect to such Superior Proposal; provided, that the Board of Directors may not effect a Change in Company Recommendation or terminate this Agreement pursuant to Section 8.1(i) unless (A) it gives Parent three (3) Business Days' prior written notice (the "Notice Period") of its intention to do so (unless at the time such notice is otherwise required to be given there are less than three (3) Business Days prior to the Company Stockholders Meeting, in which case the Company shall provide as much notice as is reasonably practicable) attaching the most current version of all relevant proposed transaction agreements and other material documents (and a description of all material terms and conditions thereof (including the identity of the Person making such Superior Proposal), (B) during the Notice Period, the Company, if requested by Parent, shall have engaged in good faith negotiations to amend this Agreement (including by making its officers and its financial and legal advisors reasonably available to negotiate in good faith) so that such Alternative Transaction ceases to constitute a Superior Proposal and (C) Parent does not make, within three (3) Business Days of its receipt of such written notification, an offer that the Board of Directors determines in good faith, after consultation with its financial and legal advisors, is at least as favorable to the stockholders as such Superior Proposal. In the event of any material revisions to the applicable Superior Proposal, the Company shall be required to deliver a new written notice to Parent and to comply with the requirements of this Section 6.5(c) with respect to such new written notice (to the extent so required).

46.     Further, defendants required voting agreements that irrevocably bind the Company's largest shareholders to vote in favor of the Proposed Buyout.  These shareholders and insiders include defendants O'Brien, Calerich, DeMare, Hobbs and Whitney and Bobby G. Solomon, Kendell V. Tholstrom, Joseph B. Feiten, Wayne P. Neumiller, Michael J. Neumiller and North Finn LLC.

47.     Lastly, despite Hess's heavy investments in the Gulf of Mexico and the related BP disaster, the Merger Agreement does not contain a "collar" or pricing adjustment provision in the event Hess's stock price drops below a certain percentage.  If the Proposed Buyout is not enjoined, American Oil shareholders are stuck with Hess stock at whatever price it has declined to at the time

of closing, even if that price exists at a significant discount to the price at the time of announcement. In other words, the merger is already a bad deal and it could very well get even worse for American Oil shareholders.

48.     In pursuing the unlawful plan to sell the Company for less than fair value in a preclusive and one-sided Merger Agreement, defendants have breached their fiduciary duties of loyalty, due care, independence, candor, good faith and fair dealing, and/or have aided and abetted such breaches.  Instead of acting in the best interests of American Oil's shareholders, defendants spent a substantial effort tailoring the Proposed Buyout to meet their own needs and those of Hess. Immediate judicial intervention is warranted here to rectify existing and future irreparable harm to the Company's shareholders.  Plaintiff seeks to enjoin the Proposed Buyout or, alternatively, rescind the Proposed Buyout in the event it is consummated.

## COUNT

### Claim for Breach of Fiduciary Duties
### Against All Defendants

49.     Plaintiff repeats and realleges each allegation set forth herein.

50.     The Individual Defendants have violated fiduciary duties of care, loyalty, candor and independence owed under applicable law to the public shareholders of American Oil and have acted to put their personal interests ahead of the interests of American Oil shareholders.

51.     By the acts, transactions and courses of conduct alleged herein, defendants, individually and acting as a part of a common plan, are attempting to advance their interests at the expense of plaintiff and other members of the Class.

52.     The Individual Defendants have violated and continue to violate their fiduciary duties by attempting to enter into a transaction without regard to the fairness of the transaction to American

Oil's shareholders.  Defendants American Oil and Hess directly breached and/or aided and abetted the Individual Defendants' breaches of fiduciary duties owed to plaintiff and the other holders of American Oil stock.

53.    As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to the shareholders of American Oil because, among other reasons:

(a)    they failed to properly value American Oil; and

(b)    they ignored or did not protect against the numerous conflicts of interest resulting from their own interrelationships or connection with the Proposed Buyout.

54.    Because the Individual Defendants dominate and control the business and corporate affairs of American Oil, and are in possession of private corporate information concerning American Oil's assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of American Oil which makes it inherently unfair for them to pursue any proposed transaction wherein they will reap disproportionate benefits, which will absolve them of their liabilities, to the detriment of holders.

55.    By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward plaintiff and the other members of the Class.

56.    As a result of the actions of defendants, plaintiff and the Class will suffer irreparable injury as a result of defendants' self-dealing.

57.    Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to plaintiff and the Class and may consummate the Proposed Buyout.

- 18 -

58.     The Individual Defendants are engaging in self-dealing, are not acting in good faith toward plaintiff and the other members of the Class, and have breached and are breaching their fiduciary duties to the members of the Class.

59.     Plaintiff and the members of the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can plaintiff and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands preliminary and permanent injunctive relief in his favor and in favor of the Class and against defendants as follows:

A.     Declaring that this action is properly maintainable as a class action;

B.     Enjoining defendants, their agents, counsel, employees, and all persons acting in concert with them from consummating the Proposed Buyout unless and until the Company adopts and implements a procedure or process to obtain the highest possible price for shareholders;

C.     Directing the Individual Defendants to exercise their fiduciary duties to obtain a transaction which is in the best interests of American Oil's shareholders;

D.     Rescinding, to the extent already implemented, the Proposed Buyout and any of the terms thereof;

E.     Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F.     Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED:  August 2, 2010                          DYER & BERENS LLP
                                                ROBERT J. DYER III
                                                JEFFREY A. BERENS


                                                       *s/ JEFFREY A. BERENS*
                                                ───────────────────────────────
                                                    JEFFREY A. BERENS

                                                303 East 17th Avenue, Suite 300
                                                Denver, CO  80203
                                                Telephone:  303/861-1764
                                                303/395-0393 (fax)
                                                bob@dyerberens.com
                                                jeff@dyerberens.com

                                                ROBBINS GELLER RUDMAN
                                                   & DOWD LLP
                                                DARREN J. ROBBINS
                                                RANDALL J. BARON
                                                A. RICK ATWOOD, JR.
                                                DAVID T. WISSBROECKER
                                                DAVID A. KNOTTS
                                                EUN JIN LEE
                                                655 West Broadway, Suite 1900
                                                San Diego, CA  92101-3301
                                                Telephone:  619/231-1058
                                                619/231-7423 (fax)

                                                GOLDFARB BRANHAM, LLP
                                                HAMILTON LINDLEY
                                                2501 North Harwood Street, Suite 1801
                                                Dallas, TX  75201
                                                Telephone:  214/583-2233
                                                214/583-2234 (fax)

                                                Attorneys for Plaintiff